## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **THERESA M. NEUMANN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-173-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### OPINION AND ORDER

Claimant, Theresa M. Neumann ("Neumann"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Neumann's application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Neumann appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Neumann was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Neumann was 57 years old at the time of the hearing before the ALJ on June 19, 2009. (R. 20). She testified that she had graduated from college. *Id.* In her application, she had claimed that her onset of disability was July 2, 2007, and she had not worked since then. (R. 20-21).

Neumann testified that her borderline personality disorder, together with depression and anxiety, were problems that kept her from working.  (R. 21-22).  One example she gave was that she became paranoid at work, convinced that her bosses were going to fire her.  (R. 22).  She testified that her depression was severe at times, and she sometimes had obsessive thoughts of death and suicide.  *Id.*  These thoughts could happen weekly, but she could also have a period of one month without them.  (R. 22-23).  She had written down on a calendar when she had really bad days of depression and suicidal thoughts, and she calculated that she averaged nine bad days a month.  (R. 23).  On a bad day, she didn't want to be around other people, she worried obsessively, she was paranoid and tearful, and she couldn't get anything done.  (R. 24).

Neumann also testified that she experienced recurring nightmares of being humiliated at work, or rejected in family relationships.  *Id.*  She said that her problems in general had started in childhood, but she felt that they had gotten progressively worse as she had gotten older.  *Id.*  She testified that her mood could be fine at one moment, and then something would happen to bother her, and she would then feel depressed.  (R. 25).  Things bothered her that didn't bother other people.  *Id.*  One example she gave was when someone didn't return a phone call, saying that it "sets me off."  (R. 25-26).

Neumann testified that she was not comfortable being around people, but she did force herself to go to group therapy, including a borderline personality disorder group.  (R. 26).  The group meetings were only one hour long, and she could leave afterward.  *Id.*  Staying at work for eight hours without being able to leave would be difficult for her.  *Id.*  She had problems with supervisors, especially male bosses.  (R. 27).

Neumann described ritualistic behavior and patterns that she followed, giving the example of meals she had every day that were the same.  *Id.*  When she was a teenager, she had

engaged in self-mutilating cutting behavior twice when she was angry or severely depressed, and she had the urge to do that at times.  *Id.*

Neumann testified that her memory was bad, and the example she gave was that when she read a book in bed before going to sleep, the next day she wouldn't remember what she had read. (R. 28).  She said that when she was nervous, she could not comprehend oral instructions.  *Id.* She could get tasks done at home on a good day, but not on a bad day.  (R. 29).

She enjoyed going to a local cemetery close to her house to watch the water fowl, and she played solitaire on her computer because she found it soothing.  *Id.*  She said that she did not see any people regularly except her therapist, whom she saw every week.  (R. 30).  She spoke to her sisters on the phone "now and then."  *Id.*

Neumann had experienced problems with medications, including side effects.  (R. 31). She had a major problem with drinking, and she testified that she had been sober since January. *Id.*  Her therapist had told her that she would be less depressed with sobriety, but she had not experienced a reduction in depression.  *Id.*  It had been over a year since she had experienced a "full-blown" panic attack, but she still had problems with anxiety.  (R. 31-32).

Neumann had experienced problems with her feet, but wearing orthotic shoes had relieved those problems.  (R. 32).  She had been diagnosed with arthritis in her hands after she experienced pain.  (R. 32-33).  She sometimes dropped items, such as kitchen utensils.  (R. 33). She had problems with sitting, due to a need to move around, but she had no problems with standing or walking.  (R. 34).

Neumann saw Kash Biddle, D.O., in 2005.  (R. 161-65).  Dr. Biddle referred Neumann to a podiatrist due to foot pain.  *Id.*  It also appears that he treated her with hormones and thyroid medication, as well as medications for depression and anxiety.  *Id.*

Neumann saw David Shadid, D.O., psychiatrist, in 2006 and 2007, but Dr. Shadid's hand-written notes are not legible.  (R. 166-71).

Neumann saw Rachel Whitehouse, D.O., as a new patient on April 3, 2006.  (R. 203). Diagnoses were whiplash, menopausal symptoms, and hypothyroidism.  *Id.*  At a follow-up appointment on April 27, 2006 to discuss lab results, the diagnoses were degenerative disc disease of the cervical spine and menopausal symptoms.  (R. 202).  These diagnoses continued at follow-up appointments in June and August 2006.  (R. 197-201).

At an appointment with Dr. Whitehouse on September 28, 2006, Neumann was diagnosed with fatigue, acne, depression, and hypothyroidism.  (R. 196).  She was started on Prozac.  *Id.*  On October 19, 2006, Neumann said that she was feeling better with Prozac and hormone medications, but she wanted to stop having "down" episodes.  (R. 195).  It appears that Dr. Whitehouse referred her for a psychological consultation.  *Id.*

Neumann presented to Laureate Psychiatric Clinic and Hospital Outpatient Services ("Laureate") on January 31, 2007, by referral from Dr. Shadid.  (R. 227).  There are various other documents from Laureate with 2007 and 2008 dates.  (R. 228-32).  Neumann presented to Laureate on June 25, 2007, and at that time, the initial assessing clinician gave Neumann's Axis I[1] diagnoses as depression and generalized anxiety depression.  (R. 221-26).  Neumann's global assessment of functioning ("GAF")[2] was assessed as 48, with a highest GAF in the past year of

---

[1]The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereafter "DSM IV").

[2]The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function

65.  (R. 222).  A master treatment plan was completed on June 26, 2007, and Neumann

completed self-assessment notes in June and July 2007, indicating that she attended 12 group

sessions.  (R. 173-86).

     At an appointment with Dr. Whitehouse on August 23, 2007, Neumann asked that her

medications be adjusted.  (R. 189).  Dr. Whitehouse diagnosed her with anxiety and depression.

*Id.*

     A psychotherapy progress note from Laureate dated June 17, 2008 states that Neumann

rated her depression as a "7," and her anxiety as a "0."  (R. 354).  On August 6, 2008, her

depression was a "6," and her anxiety a "7."  (R. 353).  There was a note from the clinician to

add alcohol use to Neumann's treatment goals.  *Id.*  There are additional psychotherapy progress

notes from August 2008 to June 2009.  (R. 331-51).

     During this same period, June 2008 through June 2009, there are Laureate medication

management notes completed by Dr. Katherine Godwin.  (R. 287-305).  At an appointment on

April 7, 2009, Neumann said that she was not doing well, and reviewed her symptoms of anxiety

and vivid nightmares.  (R. 291-92).  Dr. Godwin noted functional improvement with sobriety,

therapy, and medications, but increased depressive and anxiety symptoms.  (R. 291).  Her Axis I

diagnoses were major depressive disorder, recurrent episode, moderate, and alcohol dependence.

*Id.*  She diagnosed Neumann with borderline personality disorder on Axis II.  *Id.*  She assessed

Neumann's current and past year GAF as 60.  *Id.*

---

in almost all areas."  *Id*. at 34.  A score between 31-40 indicates "some impairment in reality
testing or communication . . . or major impairment in several areas, such as work or school,
family relations, judgment, thinking, or mood."  *Id.*  A GAF score of 41-50 reflects "serious
symptoms . . . or any serious impairment in social, occupational, or school functioning."  *Id*.

Records from Laureate indicate that Neumann attended a Chemical Dependency Intensive Outpatient group in January and February 2009.  (R. 315-30).  The clinician at her first group meeting assessed Neumann with alcohol dependence on Axis I, and borderline personality disorder on Axis II, with a current GAF of 46, and highest in the past year of 58.  (R. 330).  A discharge summary dated in March 2009 stated Neumann's Axis I diagnosis as alcohol dependence, deferring an Axis II diagnosis.  (R. 307).  Her current GAF was assessed as 62, with a highest in the past year of 65.  *Id.*

Neumann continued to see Dr. Whitehouse for hormone and gynecological treatment in 2008 and 2009.  (R. 356-66).

Neumann was assessed by agency consultant Denise LaGrand, Psy.D. on March 18, 2008. (R. 233-67).  Dr. LaGrand attached to her report 27 pages hand-written by Neumann in response to a questionnaire.  (R. 241-67).  After reviewing Neumann's background, Dr. LaGrand reported that Neumann's affect was consistent with her description of herself as sad, depressed, and anxious.  (R. 236-37).  Neumann had average immediate recall, and Dr. LaGrand estimated her long-term memory to be adequate.  (R. 237).  Dr. LaGrand's Axis I diagnoses were major depressive disorder, moderate, without psychotic features; generalized anxiety disorder; and polysubstance abuse, in remission by self-report.  (R. 238).  Her Axis II diagnoses were borderline personality disorder and obsessive compulsive personality disorder.  *Id.*  She assessed Neumann's GAF as 45.  *Id.*

Dr. LaGrand made several narrative comments about Neumann's functional abilities.  (R. 239).  She said that Neumann's ability to be reliable was fair, and her ability to interact in a socially adequate manner was poor.  *Id.*  Her capacity to cope with the demands of work and to sustain concentration was fair.  *Id.*  Her capacity to complete tasks within an acceptable

6

timeframe was poor.  *Id.*  Her problems with social interactions and poor attendance would

interfere with her ability to keep employment.  *Id.*

Agency nonexamining consultant Cynthia Kampschaefer, Psy.D., completed a Psychiatric

Review Technique Form and a Mental Residual Functional Capacity Assessment dated April 22,

2008.  (R. 268-85).  For Listings 12.04 and 12.06, Dr. Kampschaefer noted Neumann's

depressive syndrome and generalized anxiety disorder.  (R. 271, 273).  For the "Paragraph B

Criteria,"[3] Dr. Kampschaefer found that Neumann had mild restriction of activities of daily

living, moderate difficulties in maintaining social functioning, and moderate difficulties in

maintaining concentration, persistence, or pace, with no episodes of decompensation.  (R. 278).

In the "Consultant's Notes" portion of the form, Dr. Kampschaefer briefly summarized

Neumann's treatment at Laureate and noted that her memory and judgment were intact at Dr.

LaGrand's examination.  (R. 280).  She briefly listed Neumann's activities of daily living.  *Id.*

On the Mental Residual Functional Capacity Assessment, Dr. Kampschaefer found that

Neumann was markedly limited in her ability to understand, remember, and carry out detailed

instructions.  (R. 282).  She also found that Neumann was markedly limited in her ability to

interact appropriately with the general public.  *Id.*  Dr. Kampschaefer said that Neumann could

perform simple tasks with routine supervision, could relate to supervisors and peers on a

superficial work basis, could not relate to the general public, and could adapt to a work situation.

---

[3]There are broad categories known as  the "Paragraph B Criteria" of the Listing of
Impairments used to assess the severity of a mental impairment. The four categories are (1)
restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3)
difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of
decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R.
Part 404 Subpt P, App. 1 ("Listings") §12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264,
1268-69 (10th Cir. 2008).

(R. 284).

Dr. Godwin wrote a letter addressed to the ALJ on May 12, 2009, stating that Neumann's impairments caused her "profound functional limitations in her ability to engage in activities of daily living, social functioning, and in her capacity for concentration, memory and task completion." (R. 367). She described Neumann's symptoms as including "terrible anxiety, poor sleep, nightmares, decreased motivation, crying, decreased energy, erratic moods, inability to focus and concentrate, mood [lability], and suicidal thoughts." *Id.* Dr. Godwin's opinion was that Neumann's alcoholism had not caused her depression. *Id.* She concluded her letter by stating that, "[b]ased on the severity of her symptoms I do not believe Ms. Neumann can sustain a five day forty hour work week." (R. 368).

Dr. Godwin completed a Mental Medical Source Statement on June 25, 2009. (R. 370-74). She found marked limitations in 11 functional areas, and severe limitations in 9 others. (R. 371-73). The narrative remarks stated that Neumann's functional abilities would diminish under the stress of working. (R. 373). "She becomes overwhelmed with making decisions or completing tasks. She is anxious, worries and ruminates with tasking." *Id.*

**Procedural History**

Neumann filed an application dated January 22, 2008, seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq*. (R. 91-97). She alleged inability to work beginning July 2, 2007. (R. 91). The application was denied initially and on reconsideration. (R. 45-48, 51-53). A hearing before ALJ Lantz McClain was held June 19, 2009 in Tulsa, Oklahoma. (R. 17-41). By decision dated August 26, 2009, the ALJ found that Neumann was not disabled at any time through the date of the decision. (R. 9-16). On January 20, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ

represents the Commissioner's final decision for purposes of further appeal.  20 C.F.R. §

404.981.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[4]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

---

[4]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Neumann met insured status requirements through the date of his decision.  (R. 11).  At Step One, the ALJ found that Neumann had not engaged in any substantial gainful activity since her asserted onset date of July 2, 2007.  *Id.*  At Step Two, the ALJ found that Neumann had severe impairments of depression, anxiety, borderline personality disorder, and obsessive-compulsive disorder.  *Id.*  At Step Three, the ALJ found that Neumann's impairments did not meet a Listing.  (R. 11-12).

The ALJ determined that Neumann had the RFC to do a full range of work at all exertional levels, with the nonexertional limitation that "[s]he can perform simple repetitive tasks with incidental contact with the public."  (R. 12).  At Step Four, the ALJ found that Neumann was unable to perform any past relevant work.  (R. 15).  At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Neumann could perform, taking into account her age, education, work experience, and RFC.  *Id.*  Therefore, the ALJ found that

Neumann was not disabled at any time from July 2, 2007, through the date of his decision.  (R.

16).

## Review

Neumann raises issues regarding the ALJ's consideration of the opinion evidence of Dr.

Godwin and Dr. LaGrand and regarding the ALJ's RFC determination as it was incorporated into

the hypothetical question to the vocational expert.  The Court finds that the ALJ's decision must

be reversed because it did not sufficiently address the opinion evidence of Dr. LaGrand, and

therefore, the issues Neumann raises regarding Dr. Godwin's opinion evidence and regarding the

RFC determination are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more

weight than that of an examining consultant, and the opinion of a nonexamining consultant is

given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  For

opinion evidence that does not come from a treating source, the requirement is that the ALJ must

consider the opinion evidence and, if the ALJ rejects it, he must provide specific legitimate

reasons for the rejection.  *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005)

(unpublished), *citing Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003).  *Doyal* cited to

the Commissioner's own regulations and rulings that require the ALJ to consider every medical

opinion.  *See* 20 C.F.R. § 416.927(d) ("Regardless of its source, we will evaluate every medical

opinion we receive."); and SSR 96-5p, 1996 WL 374183 ("[O]pinions from any medical source

about issues reserved to the Commissioner must never be ignored.").  If an ALJ's RFC

determination conflicts with a medical opinion, then the ALJ must explain why the opinion was

not adopted.  *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished), *citing*

SSR 96-8p, 1996 WL 374184.

Here, the ALJ's discussion of Dr. LaGrand's opinion was almost absent.  The ALJ mentioned Dr. LaGrand's diagnoses when he listed Neumann's severe impairments at Step Two. (R. 11).  He mentioned that Neumann, during her appointment with Dr. LaGrand, stated that she could take care of her personal hygiene, drive, do laundry, manage her finances, care for her parrot, play games on the computer, and watch television.  (R. 14).  The ALJ also mentioned the lengthy responses of Neumann that Dr. LaGrand attached to her report, stating that Neumann's ability to complete them "indicate[s] no limitation in her ability to concentrate and [to] complete tasks."  *Id.*

The ALJ did not mention any information from Dr. LaGrand's report, other than the diagnoses, that supported Neumann's claim of disability.  He did not mention Dr. LaGrand's assessment of Neumann's GAF as 45.[5]  (R. 238).  He did not mention Dr. LaGrand's narrative statements that Neumann's ability to be reliable was fair, and her ability to interact in a socially adequate manner was poor.  (R. 239).  He did not mention the statements that Neumann's capacity to cope with the demands of work and to sustain concentration was fair, and her capacity to complete tasks within an acceptable timeframe was poor.  *Id.*  Finally, the ALJ did not mention that Dr. LaGrand stated that Neumann's problems with social interactions and poor attendance would interfere with her ability to keep employment.  *Id.*  The ALJ had a duty to discuss Dr. LaGrand's report, including the information stated above, that tended to support Neumann's claim of disability.  *Martinez v. Astrue*, 422 Fed. Appx. 719, 724-25 (10th Cir. 2011)

---

[5] This omission was made more unacceptable by the fact that the ALJ cited to GAF scores in Dr. Godwin's records that he viewed as contrasting with Dr. Godwin's opinion of "profound" functional difficulties and therefore unfavorable to Neumann's claim of disability.  (R. 14).  If a GAF score of 60 from Dr. Godwin was significant, then a score of 45 from the examining consultant should have been noted as well.

(unpublished).

In *Martinez*, the Tenth Circuit discussed this very psychologist, Dr. LaGrand, and similar provisions of her report in that case that the ALJ there did not specifically reference, although his discussion was much more thorough than that of the ALJ here.  The court as a preliminary matter stated that Dr. LaGrand's opinion was generally entitled to more weight than the opinions of the nonexamining consultants, and the court gave the factors that should have been used in determining the weight to be given to Dr. LaGrand's opinion.  *Id.* at 724.  The Tenth Circuit described as "critical" the ALJ's omission of Dr. LaGrand's statements that the claimant's "ability to be reliable is fair," and that "[h]is ability to communicate and interact in a socially adequate manner is poor," were critical omissions.  *Id.* at 724-25.  The court said that the portions of Dr. LaGrand's report that the ALJ failed to discuss were "significantly probative." *Id.* at 725.  The Tenth Circuit reversed on several grounds, including the ALJ's failure to adequately discuss Dr. LaGrand's report.  *Id.* at 728.

As stated above, the ALJ in *Martinez* discussed Dr. LaGrand's opinion in some detail, and the Tenth Circuit still found the omissions were reasons for reversal.  Here the ALJ only mentioned Dr. LaGrand's report in passing, and he did not discuss any of the portions of it that arguably supported Neumann's claim of disability.  The ALJ was required to do more, including an actual summary of the key provisions of the report that spoke of Neumann's functional abilities.  If he believed that his RFC determination was consistent with Dr. LaGrand's findings, then he needed to explain that consistency.  If he, instead, was rejecting certain portions of Dr. LaGrand's opinions, then he needed to explain that rejection and give acceptable reasons justifying that rejection.   This case must be reversed to allow the ALJ to include a proper analysis of Dr. LaGrand's report in his decision.

Because the errors of the ALJ related to the opinion evidence of Dr. LaGrand require reversal, the undersigned does not address the remaining contentions of Neumann.  On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Neumann.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 25th day of May, 2012.

Paul J. Cleary
United States Magistrate Judge